1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF WASHINGTON

8
SECURITIES AND EXCHANGE              )
9 COMMISSION,                         )   NO.  CV-13-0157-LRS
                                     )
10                     Plaintiff,     )   ORDER GRANTING SUMMARY
                                     )   JUDGMENT TO PLAINTIFF AND
11     v.                            )   DISMISSING DEFENDANT'S
                                     )   MOTIONS
12 USA REAL ESTATE FUND 1, INC.      )
   and DANIEL F. PETERSON,           )
13                                    )
                       Defendants.   )
14 _____)

15

16     **BEFORE THE COURT** is the Defendant Daniel F. Peterson's Motion

   for Summary Judgment Dismissal (with prejudice), ECF No. 30, filed
17
   February  26,  2014;  and  Plaintiff  Securities  and  Exchange
18
   Commission's Cross-Motion For Summary Judgment, ECF No. 34, filed on
19
   March 20, 2014 and noted without oral argument on June 18, 2014.
20
                         **SUMMARY OF FACTS**[1]
21
       In 2009, Defendant Daniel F. Peterson ("Peterson") founded USA
22
   Real  Estate  Fund  1,  Inc.  ("USA  Fund"),  a  Washington  state
23
   corporation that he operated from his home in Spokane Valley, until
24
   May 2013. Peterson was USA Fund's Chairman, President, and, with his
25

26   _____

27        [1]The facts are taken from Plaintiff's Statement of Facts
   ("SOF"). Defendant Peterson did not submit a separate statement of
   facts in support of his Motion for Summary Judgment nor has
28   Defendant disputed Plaintiff's SOF with specific facts or in any
   otherwise meaningful way.

   ORDER - 1

wife, its majority stockholder, and he managed and controlled all aspects of its operations. Peterson sold USA Fund common stock to 21 persons in exchange for money they provided. Peterson raised more than $400,000 from these investors. The records from USA Fund's bank (J.P. Morgan Chase Bank, N.A.) reveal that from October 22, 2010 through June 13, 2012, USA Fund deposited a total of $435,495, which it had received from 21 different persons. Peterson stated that the purpose of selling the common stock of USA Fund to the investors was "[t]o raise capital" and the price per share and amount of each investment varied based on "how bad we needed the money and the purchaser, what they wanted to put money in." The funds paid by the investors, according to Peterson, "were put into USA [Fund]." Those funds were used, in turn, to pay compensation and travel expenses to Peterson, and to pay two other individuals who were working for USA Fund.

Peterson also exchanged an additional 61,042 shares of common stock of USA Fund for a debt owed to 26 persons from another failed investment scheme. On July 14, 2010, prior to selling or exchanging any of these shares, Peterson filed a Form D[2] with the Commission on behalf of USA Fund for his purported future multi-billion dollar offering. Peterson filed three subsequent amendments to the Form D on May 24, 2011, September 9, 2011 and January 30, 2013. The Form D and the amendments each announced USA Fund's intent to offer and sell between $100 million and $100 billion worth of securities. The original and first two amended Forms D further identified "revenues"

---

[2]A Form D is a brief notice that companies file to describe their intent to offer and sell securities in unregistered transactions.

of USA Fund to be at that time in the range of between $25 million to $100 million.

Peterson's assertions of positive revenues in the Form D and amendments were false, as Peterson has since acknowledged that USA Fund actually earned no revenues prior to the July 14, 2010 filing, and also did not earn any revenues through September 9, 2011, the time of the second amendment. The third amended Form D filed on January 20, 2013 indicated revenues of between $1 and $1 million, but Peterson has acknowledged that USA Fund still has zero revenue. The Form D contains a "no revenues" option.

In addition to the sales of shares to the 21 persons to obtain more than $400,000, Peterson and USA Fund also solicited additional investors, and additional investments, by offering to sell them USA Fund common stock. In an email newsletter attachment Peterson sent in April 2012 to investors, he stated: "we have decided to give each of you a chance to increase you stock holdings [sic] in the company. The opportunity will run until the 16th of April. You may buy as little as 200 shares at $2.00 per share. We will make available as a company enough shares to cover any requests received and paid for by the deadline up to 200,000 shares."

Peterson admits, he and USA Fund have no current means to make money for, or to pay back, the common stock investors, as USA Fund "has never opened for business" and is currently "inactive." But Peterson has consistently claimed that USA Fund will offer new securities in a multi-billion dollar offering that will be the mechanism by which current common shareholders will be enriched. In

///

///

ORDER - 3

his marketing plan set out as Exhibit C to his Motion,[3] Peterson states that in July 2010, he and USA Fund prepared a filing for a $2 billion offering, just a few months before he obtained the first of the funds from common stock investors. Peterson claims that, through this new offering, raising "more than a billion dollars of investment capital is very reasonable," purportedly based on his own assumptions including selling more than a hundred million dollars of the new securities each month for a year.[4] Peterson claims this future offering has been made possible by a statute signed into law on April 5, 2012 called the Jumpstart Our Business Startups Act or the "JOBS Act." Pub. L. No. 112-106, 126 Stat. 306 (2012). In emails to investors, and in public filings with the Commission, Peterson claimed that USA Fund would raise billions of dollars in investment capital by selling securities to the public. Peterson told the USA Fund common stock purchasers that the multi-billion dollar offering would be the means for a significant pay-out to them.

By way of example, in an April 28, 2012 email and offering letter to prospective common stock investors, Peterson claimed that, following his multi-billion dollar offering of preferred securities, the price of USA Fund common stock would increase to $150 per share, as compared with the $.50 per share they would be paying to obtain the stock.  Peterson states in his Motion For Dismissal that he told investors about how the envisioned multi-billion dollar securities offering would be "secured" or "insured."  For example, Peterson states: "The investors' invested capital is protected by placing a

---

[3]See ECF No. 30-4 at 1.

[4]See ECF No. 30; ECF No. 30-11 at 2.

ORDER - 4

percentage of those funds into selected cash equivalent items such as U.S. Government Treasury bonds/notes and Top Ten World Bank Certificates of Deposit which will accumulate interest annually, that interest is reinvested every year until the maturity buy back date at which time the investor is returned the amount of their investment."[5]

On USA Fund's website, it similarly states: "our investors will know the exact date on which the financial instruments from the U.S. Government and the Top Rated US and World Insurance and Reinsurance Companies will return to them their share of the protection fund balance."  On the same website, Peterson claimed that Merrill Lynch, a prominent brokerage firm and investment bank, would hold all future investments in an "escrow account" and that Merrill Lynch would "purchase and hold all of the financial instruments that will furnish the funds to pre-purchase all stock shares at the original purchase price."  Additionally on the USA Fund website, on the frequently asked questions("FAQ") page, it states:

> Q: How do you assure the investor that they will not lose their investment?
> A: Our protection works much the same as flood insurance or earthquake or tornado insurance. We buy from the US Governments financial instruments that will provide the money to insure against loss.

Peterson made similar claims in emails and letters soliciting investors for prospective purchases of common stock. On August 18, 2011, Peterson told a prospective investor that Merrill Lynch would buy "guarantee instruments and then transfer the net proceeds to USA [Fund]."  On July 9, 2012, Peterson told investors that the USA Fund

[5]ECF No. 30 at 4.

had just begun "marketing of our 20 Year Preferred shares both on our own and in conjunction with Merrill," when there was no marketing arrangement. In an April 28, 2012 letter offering stock to more than 100 potential investors, Peterson said that Merrill Lynch would set aside 25% of the money raised from the second offering to preferred shareholders into an account "that grows and pays back the investors all of their invested dollars in the future."

In his Motion For Dismissal, Peterson describes the claimed guarantee, pointing to a 2002 Smith Barney brochure describing an account with a limited guarantee, as a supposedly comparable investment.[6]  The Smith Barney brochure describes a five-year "Guarantee Period" "backed by an unconditional, irrevocable financial guarantee pursuant to a financial guarantee insurance policy issued for the benefit of the shareholders of the fund ...".[7] However, unlike the Smith Barney brochure, Peterson's stated basis for calling the USA Fund guaranteed or secured, did not include an arrangement for, or payment for, any such insurance. Instead, Peterson claimed, and still claims, that investments in Treasuries and CDs in an account supposedly managed by Merrill Lynch would somehow provide such insurance against loss.[8]

Contrary to Peterson's assertions to the investors, there was no "escrow account" or "protection fund" with Merrill Lynch, nor had Peterson ever discussed the possibility of such an account with

---

[6]ECF No. 30 at 4-5 ("Major investment firms such as Smith Barney have used this process for decades."

[7]ECF No. 30-5 at 2.

[8]ECF No. 30 at 4.

Merrill Lynch. Further, Peterson's claims prove mathematically impossible. He promised that the "protection fund" would be comprised of 25% of the principal invested, but that the very same "protection fund" would itself quadruple in value to replace the remainder of the principal. However, the government securities (and bank CDs) Peterson said would be purchased with those funds could not achieve such returns. Between August 2011 and April 2013, the yield on U.S. Treasury instruments maturing in 20 years was less than 2%. Even if USA Fund had created a "protection fund" that remained invested for 20 years, to achieve the projected results, the protection fund would have had to consistently earn annualized returns of well more than double the yield on the U.S. Treasury instruments.[9]  From January 1, 2010 through May 31, 2013, the 6-month CD rates never reached 1%, often less than 0.5%.[10]

Peterson's promise to the common stock investors was based on a further misstatement that rendered his claims impossible. He claimed that early investors could split among them the monies raised from future investors, minus the 25% to be set aside for the "protection fund," and thus ignored, and failed to disclose, that those future security holders would also have a claim on the funds they invested. Peterson also disregarded that those monies were supposed to be invested in other projects, according to his own

---

[9]The Court takes judicial notice of the U.S. Treasury public reports on the http://www.federalreserve.gov/releases/h15/data.htm website.

[10]The Court takes judicial notice in the U.S. Federal Reserve Systems' historical interest rates published on the http://www.federalreserve.gov/releases/h15/data.htm website.

projections.  Peterson thus told persons who were purchasing common stock that the various businesses and financial schemes of USA Fund would generate massive returns using the money of investors in the future offering. The wide-ranging business plan included investments in technology start-ups, mortgage notes, defaulted real estate, "conduit lending," and development of a resort called "Xanadu."

Peterson posted return-on-investment projections on USA Fund's website for each of the company's constituent funds, which purported to show projected earnings on a $1,000 investment over 10 years. Peterson's projections showed consistent, year-over-year earnings culminating in returns for USA Fund investors of 500% to more than 1,300%.  Peterson was unable to produce any numerical analysis to support these incredible projections.  Peterson's projections that he prepared for USA Fund common stock investors reveal his "assumptions" that the purported means by which common stock investors are paid out would be through raising money from sales of shares. Peterson projected raising $1.4 billion cumulatively through such future sales of stock.

Peterson promised remarkable returns for early investors, which he projected on a per-share basis. In a January 18, 2012 email to prospective investors, Peterson sent a spreadsheet showing that an investment of $10,000 (5,000 shares at $2 per share) would yield $376,552 in returns in five years. Peterson claimed that the board and Merrill Lynch have signed off on these projections. Peterson admits that he told investors that his scheme had the backing of two major investment firms, Merrill Lynch and BlackRock. Contrary to Peterson's assertions to investors, Merrill Lynch never reviewed or approved his projections for USA Fund.  Contrary to Peterson's

claims, BlackRock denied that Peterson and USA Fund had any such affiliation. Instead, Blackrock clearly stated that it "does not have any investment or commercial relationship with the [USA] Fund." Peterson simply could not offer any numerical analysis to support his claims.

Finally, as of June 17, 2013, Peterson claimed to have resigned his position as an officer and director of USA Fund and each of its subsidiaries. The Preliminary Injunction Order prohibits Peterson from acting as an officer or director of USA Fund, or from controlling or managing it in any way until further order of the Court.[11] Despite the explicit prohibition against his acting as a director of USA Fund, Peterson stated in a Declaration filed in this matter on March 13, 2014, that he is a "member of the board of directors of USA Real Estate Fund 1, Inc."[12] Despite the prohibition against his directly or indirectly managing USA Fund in any way, in a Notice of Appearance on behalf of himself as a *pro se* litigant, Peterson stated that he would be "securing new counsel for Defendant USA Real Estate Fund 1, Inc. as soon as it is financially feasible."[13]

**ANALYSIS**

**I.  Legal Standard - Summary Judgment**

The summary judgement procedure is appropriate for promptly disposing of actions. See Fed. R. Civ. Proc. 56. The judgment sought

---

[11]See Stipulated Preliminary Injunction Order, ECF No. 16, entered on June 20, 2013.

[12]ECF No. 33 at 1.

[13]ECF No. 29.

ORDER - 9

will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. V. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 325. "A moving party without the ultimate burden of persuasion at trial ... may carry its initial burden of persuasion of production by either of two methods. The moving party may produce evidence negating an essential element of the non-moving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir.2000). If the movant meets its burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. V. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In opposing summary judgment, the nonmoving party may not rest on his pleadings. He "must produce at least some 'significant

probative evidence tending to support the complaint." *T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

The Court does not make credibility determinations with respect to evidence offered, and is required to draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31 (*citing Matsushita*, 475 U.S. at 587). Summary judgment is therefore not appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts..." *Hollingsworth Solderless Terminal Co. V. Turley*, 622 F.2d 1324, 1335 (9th Cir. 1980). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir.1999).

## II.  Violations of the Securities Laws

Plaintiff asserts Defendant Peterson violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), which prohibit the making of materially false or misleading statements to investors in the sale of securities.

### A.  Securities Exchange Act--Section 10(b) and Rule 10b-5

Securities Exchange Act Section 10(b) and Rule 10b-5 together make it "unlawful for any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of a

security." 17 C.F.R. § 240.10b-5(b). The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation. . . . And Congress has imposed statutory requirements on that private action . . . (citations omitted). In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-40 (1975), the Supreme Court, relying chiefly on "policy considerations," limited the Rule 10b-5 private right of action to plaintiffs who themselves were purchasers or sellers.

A violation of the antifraud provisions is established by evidence that (1) defendant(s) made a material omission or misrepresentation; (2) in connection with the purchase, offer or sale of a security; (3) involving interstate commerce; and (4) with scienter. *SEC v. Platforms Wireless*, 617 F.3d at 1092; *SEC v. Rana Research, Inc*., 8 F.3d 1358, 1364 (9th Cir. 1993). Each of these elements is satisfied here as discussed below.

## B.  Securities Act Section 17(a)

Similarly, Securities Act Section 17(a) prohibits any person, in the offer or sale of a security, from employing any deceptive device; or from obtaining money by means of material misrepresentations of fact or omissions of fact; or engaging in any transaction, practice or course of business which operates or would operate as a fraud upon the purchaser. 15 U.S.C. § 77q(a)(1)-(3).

### 1.  Peterson Made Materially False Statements to Investors

Peterson made material misrepresentations of fact to the common stock investors and to potential investors, both in his own name and on behalf of USA Fund. Peterson acknowledged that he approved all of the content on the USA Fund website, and is therefore the "maker" of

USA Fund's misrepresentations made there.

Misrepresentations and omissions of fact are considered "material" if there is a substantial likelihood that a "reasonable investor" would consider them significant to the total mix of available information. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988). *See United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011) ("the standard of materiality is an objective one," based on whether a "reasonable investor" would consider the false or omitted information "useful or significant").

The Court finds that Peterson made materially false assertions about the purported involvement of prominent investment firms, Merrill Lynch and BlackRock, in order to give the illusion of legitimacy to the USA Fund. Peterson's Form D filing with the Commission, on behalf of USA Fund, contained materially false and misleading claims about USA Fund's purported revenues of between $25 million and $100 million, or later, between $1 and $1 million, which he now admits USA Fund has never earned. Peterson admitted USA Fund has never actually "opened for business". ECF No. 30 at 2. False claims of substantial unearned revenue, or the substantial overstatement of revenue, are "material" to reasonable investors. Peterson's numerous falsehoods were made to portray a seemingly legitimate, safe and fictionally profitable multi-billion dollar offering. *Gould v. American Hawaiian S.S. Co.*, 331 F. Supp. 981, 997 (D. Del. 1971) (aggregate effect of numerous falsehoods most clearly evidenced materiality). *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1997) ("A company that substantially overstates its revenues by reporting consignment transactions as sales makes false or misleading statements of material fact.").

Peterson attempts to justify his actions by suggesting that his exceptionally high projections for returns are in keeping with real financial examples.[14] Peterson also argues that his sales of securities to the common stock investors are somehow exempt from registration requirements of the Securities Exchange Act and he should be protect from this suit and federal jurisdiction.[15] Finally, Peterson's arguments that the investors "solicited" him, and letters[16] he extracted from them after the fraud was complete, doesn't change this court's view that fraudulent, material representations were made. Had investors known that his basis for projecting the unrealistically high returns was Peterson's personal belief, they could have understood the real risk of giving their money to Peterson and USA Fund.

## 2. Peterson's Requisite Scienter

Scienter is an element of any Section 10(b) and Rule 10b-5 claim, and it is also required to prove violations of Section 17(a)(1). However, scienter is not an element required to prove violations of Sections 17(a)(2) or (3); rather, the lesser mental state of negligence will suffice. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). Recklessness is misconduct that is "so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*,

---

[14]Peterson attempts to justify his claims by comparing his claims to three hypothetical "investments" that are purportedly akin to returns on investment exceeding 500% to 1300% : a purchase of Microsoft stock during some unstated 10-year period; a purported payment stream on an usurious "loan" of $1,000 with an 89% interest rate; and a payment stream to a pawn shop over a ten-year period. ECF No. 30-6, Exh. E, F, and G.

[15]ECF No. 30 at 30-2, Exh. A.

[16]ECF No. 30; ECF No. 30-3.

914 F.2d 1564, 1569 (9th Cir. 1990). It may be inferred from circumstantial evidence suggesting an obvious risk of misleading investors that is so great that it is simply implausible that defendant did not know about it. *Vernazza v. SEC*, 327 F.3d 851, 860-61 & n. 8 (9th Cir. 2003); *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994).

In the Ninth Circuit, "[s]cienter may be established, therefore, by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010).

The court has no difficulty finding that the requisite scienter existed, considering Peterson's descriptions to investors about the supposed affiliation with Merrill Lynch and BlackRock when there was no actual partnership. It is simply implausible that Peterson, who appears quite articulate in his pro se briefing, did not know full well that he was deceiving investors. *See Vernazza v. SEC*, 327 F.3d 851, 860-61 & n. 8 (9th Cir. 2003).

### 3. Misrepresentation Connected to Security Purchase/Offer/Sale in Interstate Commerce

The remaining elements require that the material misrepresentations or omissions occur in the purchase, offer or sale of security involving interstate commerce. Peterson admits that he sold securities to the common stock investors. Each of the misrepresentations, including direct email solicitations, the USA Fund's website, and the Form D that Peterson filed for USA Fund, was used to encourage investors to invest. Accordingly, his fraud was in connection with the offer to sell or sales themselves. See SEC v.

Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir.1993)("in connection with" requirement is generally met where fraudulent statements are circulated or made available to potential investors). Peterson also made extensive use of the Internet, emails, telephone calls to persons outside Washington (such as Marek of Merrill Lynch) to perpetrate his fraud, satisfying the jurisdictional, interstate commerce element. *Fratt v. Robinson*, 203 F.2d 627, 633-34 (9th Cir. 1953) (the use of mails, wires, etc. need not be the mechanism for the fraud itself). Accordingly, the evidence not <u>reasonably</u> in dispute satisfies the elements needed to prove Peterson's securities fraud. In addition, Defendant Peterson's untimely declaration (ECF No. 52) filed June 16, 2014, weeks after the pending motions herein were under advisement, is of no force or effect and does not change the Court's ruling.

The court finds that based on the parties' submissions, there is no genuine factual dispute remaining to be tried as Peterson has failed to meet his burden of providing specific facts demonstrating a genuine factual issue for trial. Peterson largely admits to facts that establish his liability for securities fraud. Peterson repeatedly made material statements to investors that had no basis in reality and which he knew lacked any support. Those statements included baseless claims both about the supposed lack of risk and the incredible, projected rewards for the investors in USA Fund, as well as false and misleading claims about USA Fund's purported prominent partners in its financial business. To the extent that Peterson may have had a "theory" as to how he could achieve such historical returns using Treasuries and CDs, he did not disclose it
///

ORDER - 16

to shareholders, as Peterson has not explained what of truth, if anything, he disclosed to the investors in his motion.[17]

Summary judgment is thus appropriate on the Commission's claims against Peterson him for violating the antifraud provisions of the Securities Act and the Exchange Act. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir.2010).

**IT IS HEREBY ORDERED** that:

1. Defendant Daniel F. Peterson's Motion for Summary Judgment Dismissal (with prejudice), **ECF No. 30,** is **DENIED.**

2. Defendant Daniel F. Peterson's Motion for Reconsideration Re: Motion For Summary Judgment, **ECF No. 43,** is **DENIED.**

3. Plaintiff's Cross-Motion For Summary Judgment, **ECF No. 34,** is **GRANTED.** Summary judgment is granted in favor of the Commission on the claims that Defendant Peterson is liable for violations of the antifraud provisions under Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], and Section 17(a)(1)-(3) of the Securities Act of 1933 [15 U.S.C. § 77q(a)(1)-(3)].

The District Court Executive is directed to enter judgment consistent with this order and provide copies to Plaintiff and to Defendant at his last known addresses[18].

**DATED** this 26th day of June, 2014.

*s/Lonny R. Suko*
_____
LONNY R. SUKO
Senior United States District Judge

---

[17]ECF No. 30 at 4-5, 9.

[18]The court notes that mail sent to Defendant Peterson on June 5, 2014 addressed to 700 West 7th Avenue #808, Spokane, WA, 99204 was returned to the court as being undeliverable.